[Cite as *In re J.R.*, 2023-Ohio-1920.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.R.

Court of Appeals No.  L-23-1026

Trial Court No.  JC 21287051

**<u>DECISION AND JUDGMENT</u>**

Decided:  June 9, 2023

* * * * *

Jeremy G. Young, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**DUHART, P.J.**

**{¶ 1}** This is an appeal by appellant, P.M., from the January 26, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated his parental rights to minor child, J.R., and granted permanent custody of J.R. to appellee, Lucas County Children Services ("LCCS" or "agency").  For the reasons that follow, we affirm.

**{¶ 2}** Appellant set forth one assignment of error:

Appellant was not afforded effective assistance of counsel.

## Background

**{¶ 3}** Appellant is the father of J.R., who was born in March 2007. J.R.'s mother is H.R. Mother is not involved in this appeal.

**{¶ 4}** For most of J.R.'s life, she lived with appellant, and he had custody of her. Mother was not involved in J.R.'s life. On November 23, 2021, J.R. ran away from home and sought help at a gas station, claiming appellant sexually abused her. That same day, LCCS received emergency custody of J.R., and she was placed in a foster home. Appellant was arrested and charged with six counts of rape of J.R. He remained incarcerated throughout the entirety of the case.

**{¶ 5}** On November 24, 2021, LCCS filed a complaint in dependency, neglect and abuse with respect to J.R., and requested a shelter care hearing. A hearing was held, LCCS was awarded interim temporary custody of J.R. and a no-contact order between appellant and J.R. was issued.

**{¶ 6}** On January 31, 2022, an adjudication hearing was held and J.R. was found to be dependent, neglected and abused. That same day, disposition occurred, and the juvenile court found it was in J.R.'s best interest to be placed in LCCS's temporary custody. The no-contact order between appellant and J.R. was continued.

**{¶ 7}** A reasonable efforts hearing was held on May 31, 2022, where the court found LCCS continued to make reasonable efforts. J.R. had been spending time with

2.

mother on zoom. On November 23, 2022, an annual review hearing was held, where it was reported that mother had moved out of state for a job. LCCS had filed a motion for permanent custody and to extend temporary custody. The court found LCCS continued to make reasonable efforts, and it was in J.R.'s best interest to extend LCCS's temporary custody.

{¶ 8} On January 18, 2023, the permanent custody hearing was held; neither mother nor appellant attended. The court issued its judgment entry on January 26, 2023, awarding permanent custody of J.R. to LCCS. Appellant appealed.

### Shelter Care Hearing/Dispositional Hearing

**Assessment Caseworker Nicole Dembski**

{¶ 9} At the hearings, Dembski, the assessment caseworker for J.R., testified to the following. LCCS received an emergency referral on November 23, 2021, based on allegations by J.R. that she was sexually abused by her father, appellant. J.R. had gone to a gas station and told an employee about the on-going abuse by appellant. J.R. was taken to the police station where she was interviewed, after which she was brought to the agency. Dembski met with J.R. briefly, then Dembski went to the police station where appellant was interviewed by police; Dembski was present for that interview. At the completion of his interview, appellant was arrested, was charged with six counts of rape, and was held in jail. Appellant's bond was set at $250,000, no ten percent. LCCS requested an ex parte order, which was granted, and J.R. was placed in the emergency

3.

custody of the agency; J.R. spent the night in foster care.  A no-contact order was issued between appellant and J.R.

{¶ 10} On November 24, 2021, Dembski interviewed J.R., who disclosed that appellant starting sexually assaulting her when she was seven years old, with the last incident occurring five days prior.  J.R. detailed the abuse, including that she was penetrated by appellant, she was made to watch pornography, and she was made to perform sex acts on appellant.

{¶ 11} Dembski testified J.R.'s mother did not have custody of J.R., as mother had substance abuse issues, so appellant had received custody of J.R. in 2013.  J.R. reported that she made disclosures of the sexual abuse to several family members, starting when she was eight years old, but she felt they did not believe her.

{¶ 12} Dembski testified, with respect to the allegations in the complaint, that "the disposition was substantiated sexual abuse."  She noted that appellant did not admit to any of the allegations.

**Dr. Randall Schlievert**

{¶ 13} At the dispositional hearing, Dr. Schlievert, a medical doctor and an expert in pediatric child abuse, testified that he conducted a medical evaluation of J.R. on November 24, 2021.  The evaluation was undertaken for the purposes of medical diagnosis and treatment of alleged sexual abuse.  A female social worker did the bulk of the interview while Dr. Schlievert was in the room typing and adding questions as needed.  A physical examination of J.R. was performed and it was normal, which is not

4.

unusual in a sexual abuse case. A vast majority of children, teenagers and adults will have normal exams, especially if the abuse occurred more than three or four days prior.

{¶ 14} Dr. Schlievert made a diagnosis of likely sexual abuse, based primarily on the medical history provided by J.R., which included the kind of sex acts appellant made J.R. do, the things appellant would say to J.R. after the acts occurred, and threats appellant made to J.R. to not tell. In addition, J.R. did not have contact with her mother, so mother was not there to protect J.R. The fact that J.R. "ran away for nothing positive, not a custody dispute, not a I want to go live with mom instead of dad dispute. Basically I ran away because I couldn't take it anymore." The doctor authored a report with more details of the medical history given by J.R. The doctor stated he does not make a diagnosis of likely sexual abuse often, and when he does, he is willing to state under oath that the diagnosis is accurate to the best of his training, background and experience.

{¶ 15} Dr. Schlievert recommended that J.R. have counseling, a stable placement and no contact with appellant.

**Ongoing Caseworker Angela Duwve**

{¶ 16} At the dispositional hearing, Duwve, an ongoing caseworker for J.R., testified to the following. Duwve was assigned J.R.'s case following the first ongoing caseworker, Laura Rubley. Duwve reviewed the case plan services for J.R.'s family, noting the case plan goal for J.R. is not reunification with appellant, and appellant had no services, as he must first resolve his pending criminal charges.

5.

## The Permanent Custody Hearing

{¶ 17} LCCS called two witnesses to testify at the permanent custody hearing. The relevant testimony is summarized below.

**Caseworker Carrie Tester**

{¶ 18} Tester testified she was assigned as the ongoing caseworker for J.R. on June 7, 2022. Tester spoke with appellant on December 15, 2022, when he reached out to her on the phone. He had called Tester and left messages on her office voicemail, which indicated it was a call from the jail, 10-20 times a day, on average. Tester described the call, where appellant "attempted to litigate his case in regards to the rape of [J.R]. He wanted to engage in conversation about the circumstances and the evidence that he considered on his side to prove him to be not guilty." Tester listened. Appellant said his desired outcome of the conversation was to drop the LCCS case. He did not inquire about J.R. Tester asked if appellant knew of any potential family members with whom J.R. could be placed, but appellant did not answer that question, as he said it was not necessary to find another relative, because J.R. should return home to him.

{¶ 19} Tester recalled J.R. came in to care when she, J.R., left her home with appellant, went to a gas station and asked for help from the staff. J.R. disclosed that she had been raped by her father more than once and did not want to go home. The staff reached out to LCCS, and police became involved. Appellant was arrested and charged with six counts of rape. He has been in jail for the entire duration of the case.

6.

**{¶ 20}** J.R. did not have a relationship with her mother. It was Tester's understanding that mother gave appellant custody of J.R. at birth.

**{¶ 21}** There were no services on the case plan for appellant because of his criminal charges. Appellant was ordered to have no contact with J.R. Case plan services for J.R. were counselling, and she sees a counselor once a week. J.R. is doing very well in school, she has friends and she is in the band. J.R. also has a job two evenings a week.

**{¶ 22}** J.R. is in foster care and has an excellent relationship with her foster family; she is thriving. This is the only foster home J.R. has had since she came into care. J.R. has been in LCCS's temporary custody since November 2021. LCCS is seeking permanent custody of J.R., as it is in J.R.'s best interest not to be reunified with appellant, due to him being incarcerated and the pending charges. The foster family is not seeking to adopt J.R., but she can remain in the foster home while LCCS has permanent custody of her for the next three years. In the meantime, LCCS is exploring some leads for foster home that will adopt J.R.

**{¶ 23}** Tester testified J.R. indicated she did not want to return to appellant's care. J.R. is very comfortable in her foster home.

**GAL Christine Caryer**

**{¶ 24}** Caryer testified she is the guardian ad litem ("GAL") for J.R., and she was appointed on December 1, 2021. Caryer undertook an independent investigation, including reviewing court records, school records, meeting with J.R. almost once a month, and meeting and talking with mother. Caryer prepared a report, filed December

7.

29, 2022. Caryer did not talk with appellant, as he did not contact her, and she never tried to contact him. Caryer was aware that appellant was charged with six counts of rape of J.R., and J.R. was adjudicated abused, neglected and dependent by the juvenile court.

{¶ 25} Caryer testified J.R. is doing great, J.R. is happy where she is and J.R. is adamant that she does not want to be reunified with appellant.

{¶ 26} In her report, Caryer recommended it was in J.R.'s best interest that permanent custody be awarded to the agency, and that J.R. stay in her current placement unless and until she is adopted. Caryer testified J.R. has come a long way and deserves to be in a safe, stable home, which is where J.R. is now. J.R. does not feel safe with appellant. Caryer noted in her report that J.R. reported that she disclosed the abuse to her maternal and paternal relatives, but the relatives failed to intervene.

### Juvenile Court Decision

{¶ 27} On January 26, 2023, the court issued its judgment entry granting permanent custody of J.R. to the agency. The court found, by clear and convincing evidence under R.C. 2151.414(B)(1)(a), that J.R. could not and should not be placed with either parent within a reasonable time, and pursuant to R.C. 2151.414(D)(1), it was in J.R.'s best interest to grant permanent custody to LCCS.

{¶ 28} The court detailed the testimony and evidence offered at trial, upon which it relied in reaching its findings of fact and conclusions. The court noted the case plan services offered to J.R., which included counseling, and that no services were offered to father, due to his incarceration. The court observed that father has not visited J.R. since

8.

his incarceration in November 2021, due to his criminal charges and the no-contact orders.

{¶ 29} The court noted the caseworker and GAL testified that permanent custody is in J.R.'s best interest, and the GAL testified that J.R. wishes to be adopted, and does not want contact with her father. The court observed that J.R. has been in the custody of LCCS since November 23, 2021, and she is doing extremely well in her foster home, given the facts of the case.

{¶ 30} The court found that J.R. needs a legally secure permanent placement, and that goal cannot be achieved with either of her parents. The court determined no evidence was presented to convince the court that J.R.'s father can provide a legally secure permanent placement for her. Rather, the court had grave concerns about J.R. in her father's care and found it would be contrary to her safety to return to him.

{¶ 31} As to relatives, the court found that no relatives came forward to express an interest in J.R., that were suitable for placement. The court noted the GAL testified that J.R. made disclosures to both maternal and paternal relatives of the sexual abuse she was suffering, which went unheeded, and it was a stranger in the community who took action to keep J.R. safe.

{¶ 32} The court concluded R.C. 2151.414(E)(1), (5) and (15) applied, and found, as to R.C. 2151.414(E)(15), that father committed abuse under R.C. 2151.031, against the child, and the court had adjudicated J.R. abused, neglected, and dependent, by clear and convincing evidence. The court acknowledged that father has not been convicted, and he

9.

remains innocent until proven guilty, yet the court determined that the seriousness, nature, or likelihood of recurrence of the abuse makes J.R.'s placement with her father a threat to J.R.'s safety.

## Assignment of Error

{¶ 33} Appellant argues his counsel was ineffective because counsel did not secure appellant's attendance at hearings in this case, and most importantly, counsel failed to secure appellant's presence for the permanent custody trial. Appellant maintains the permanent custody trial was the last chance for him to speak, and a reasonable and competent attorney would have had appellant brought over from the jail. Appellant noted his attorney had almost two months to file a motion to convey.

{¶ 34} Appellant acknowledges it is his burden to prove that this ineffective assistance of counsel prejudiced him. Appellant submits that twice in the permanent custody order the judge stated she made her findings in part because no contrary evidence was presented. Appellant notes that the trial court admitted he maintained his presumption of innocence, but due to appellant's inability to schedule a criminal jury trial fast enough to fit the juvenile court's schedule, he, in essence, lost that presumption of innocence.

{¶ 35} Appellant argues that had he been conveyed at any point in this case to sit in front of the court and be permitted to take the stand, maybe someone other than his counsel could hear his side of the story, as he maintains his innocence, and he could have elaborated about J.R.'s mental health struggles and how that could play into her

10.

accusations. In addition, appellant could have provided specific names of relatives who could care for J.R., which would have allowed for legal custody only.

{¶ 36} Appellant also asserts his counsel was ineffective for failing to request a six-month continuance of the case so appellant's criminal case could be wrapped up. Appellant contends J.R.'s case had four more months on it, and an entire criminal trial can be held in that time. Appellant argues it would not have caused any bit of harm to J.R. for the case to stay open for the maximum amount of time allowed by law so he had every opportunity to present his evidence and confront these accusations.

{¶ 37} In response, LCCS notes that appellant argues that he was not provided effective assistance of counsel because he was not conveyed to the trial, thereby prejudicing his case. LCCS further observes that appellant does not challenge the two-pronged test required for a court to award permanent custody of a child to a public children services agency, he does not challenge the trial court's finding that J.R. cannot or should not be returned to her parents, and he does not challenge the finding that permanent custody is in J.R.'s best interest.

{¶ 38} LCCS asserts that appellant's counsel effectively cross-examined witnesses at the trial, presented appellant's argument that permanent custody should not be granted to the agency, and a full record of the proceedings was made. LCCS contends that appellant fails to make any plausible arguments that anything would have changed the outcome of the trial, including having his lawyer file a motion to convey, having appellant present at trial or having a different lawyer.

11.

**Law**

{¶ 39} To prevail on a claim for ineffective assistance of counsel, appellant must show trial counsel's performance fell below an objective standard of reasonable representation and prejudice resulted from counsel's deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 137, 538 N.E.2d 373 (1989), paragraph two of the syllabus, *following Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688.

**Analysis**

{¶ 40} Appellant argues his trial counsel was ineffective because counsel did not ensure that appellant could attend any of the hearings, and in particular, the permanent custody hearing, so appellant could testify that he was innocent, and appellant could have elaborated about J.R.'s mental health struggles and how those struggles could play into her accusations.

{¶ 41} As discussed above, the juvenile court recognized that father had not been convicted of the criminal charges, and remained innocent until proven guilty. Yet, the juvenile court adjudicated J.R. abused, neglected and dependent, by clear and convincing evidence. We note that evidence before the juvenile court included Dr. Schlievert's diagnosis of likely sexual abuse of J.R. by her father, and the doctor's testimony and report regarding J.R.'s medical history describing the sex acts appellant made J.R. do,

12.

what appellant said to J.R. after the sex acts, and the threats appellant made to J.R. not to tell about the sex acts.

{¶ 42} Upon a thorough review of the record, we find no indication that there would have been a different result had appellant's counsel filed a motion to convey so appellant could attend the hearings in the proceedings regarding J.R. and testify. We observe there was evidence presented at the permanent custody hearing, in caseworker Tester's testimony, that appellant told her about the circumstances which he considered were on his side to prove him to be not guilty. Thus, the fact that appellant sought to add extra proof that he maintained his innocence would have been cumulative, and does not support a finding that the outcome of the juvenile proceedings would have been different.

{¶ 43} Given the abundance of evidence in the record by the caseworkers, the GAL, and Dr. Schlievert, an expert in pediatric child abuse, concerning J.R.'s likely sexual abuse by appellant, we find that appellant has not shown that his trial counsel's performance fell below an objective standard of reasonable representation or that prejudice resulted because trial counsel did not file a motion to convey or secure appellant's attendance at the juvenile court hearings. Therefore, we find that appellant has not sustained his burden to prove ineffective assistance of trial counsel. Accordingly, appellant's assignment of error is not well-taken.

13.

**{¶ 44}** The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.  The clerk is ordered to serve all parties with notice of this decision.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.          

Myron C. Duhart, P.J.        

Charles E. Sulek, J.         
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.